IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

YASSIN SAFDAR MOHAMMAD,            )
                                  )
        Plaintiff                 )
                                  )
    v.                            )        Civil Action No. 05-580
                                  )
                                  )        Chief Judge Donetta W. Ambrose/
JEFFREY BEARD; Father BILL        )        Magistrate Judge Amy Reynolds Hay
TERZA, Chaplain Supervisor;       )
HARRY WILSON, Superintendent;     )
MIKE ZAKEN, LTSU Manager;         )
                                  )
        Defendants                )        Re: Dkt. [97]

REPORT AND RECOMMENDATION

RECOMMENDATION

        It is recommended that Defendants' motion for summary judgment be granted and that

summary judgment be entered in favor of Defendants.

REPORT

        Yassin Mohammad ("Plaintiff"), a prisoner, has filed a civil rights suit against employees

of the Pennsylvania Department of Corrections ("DOC").  He alleged that the Defendants do not

permit him, as a prisoner housed in the Long Term Segregation Unit ("LTSU") to possess a

prayer rug, which Plaintiff asserts is essential to his religious observance as a Sunni Muslim.  He

contends that such a restriction violates his free exercise rights under the First Amendment and

his statutory rights under the Religious Land Use and Institutionalize Persons Act  ("RLUIPA"),

42 U.S.C. § 2000cc-1(a).

**A.  Relevant Procedural History**

        This case was originally filed in the Middle District of Pennsylvania.  Mohammad v.

Kelchner, No. 3:CV-03-1134 (M.D. Pa. Filed July 9, 2003).  At that time, Plaintiff was housed in

SCI-Camp Hill which is located within the Middle District.  He was placed in the Special

Management Unit ("SMU") at SCI-Camp Hill.  Judge Munley of the Middle District, described

the factual background of this case as follows:

> The SMU is a special unit designed to deal with inmates who have
> presented disciplinary problems in the general population and who present a risk
> to other inmates, the prison staff, or the institution in general.  The SMU varies
> the prisoners' property restrictions and privileges based on their behavior.  The
> SMU encourages good behavior with additional privileges and punishes rule
> infractions, called "misconducts," with greater restrictions.  Prisoners in the SMU
> are categorized into five "Phases," with Phase V being the most restrictive, and
> Phase I being release into the general prison population.  Phase V is referred to as
> "disciplinary custody," while Phases I-IV are "administrative custody."
>
> Mohammad currently has accumulated enough misconducts that he will be
> in Phase V until the year 2022. Mohammad does not contend that he was
> wrongfully placed in the SMU or that he is not dangerous.  As a practicing
> Muslim in Phase V, Mohammad is allowed to keep a Qu'ran and a prayer hat in
> his cell.  Mohammad is also allowed to keep additional written materials,
> including scripture, in a records box in his cell.  Also, a Muslim cleric visits him
> once a week in his cell to guide him in the practice of his religion.
>
> [     ]The Qu'ran commands that Muslims pray five times a day. When a
> Muslim prays, he kneels on the ground, and prostrates his upper body to the floor.
> As a result, the Qu'ran mandates that Muslims pray on a clean surface.  The
> standard practice among Muslims in general is to pray on a prayer rug to ensure
> that their prayer surface is clean. Prayer rugs, however, are not mandated by the
> Qu'ran and are prohibited in the SMU.
>
> Muslim prisoners in the SMU ensure the cleanliness of their prayer surface
> in a number of ways.  Some lay a towel, blanket, or sheet beneath them.  Others
> use cleaning supplies to cleanse the floor immediately before praying.  SMU
> guards have observed Muslim prisoners, including Mohammad, using these
> alternatives to prayer rugs.  On one occasion, Mohammad placed a clean t-shirt on
> the ground before praying.
>
> Mohammad asserts that the alternatives to prayer rugs are insufficient to
> ensure a clean praying surface.  Periodically throughout the day, Mohammad and
> guards track dirt into his cell.  While other prisoners have cleaning supplies, the
> SMU has revoked Muhammad's [sic] cleaning supplies privilege because of his
> repeated misconducts.  Furthermore, the linens furnished to the prisoners are
> extremely limited, and are exchanged infrequently.  Each prisoner receives two
> sheets, two blankets (one in the summer), one jump suit, and one pillow case.
> Prisoners may exchange their linens once per week, and their jumpsuit and towels
> twice per week. As a result, prisoners will frequently have no unused towels,
> linens, or clothing, on which to pray.  Furthermore, in Mohammad's case, the
> items become dirty when they are placed on the ground because he does not have
> supplies to clean his floor.
>
> Additionally, the SMU has a rule prohibiting the prisoners from using their
> prison issue items in any manner other than their intended use.  The rule states
> that misuse results in a misconduct.  The prison officials do not strictly enforce
> this rule, and have not issued misconducts to Muslim prisoners who lay their

items on the floor to pray.  While Defendant Steigerwalt has permitted
Mohammad to lay his items on the floor, other SMU Unit Managers have
instructed him not to.  No SMU Unit Manager has given Mohammad a
misconduct for this practice.

Mohammad v. Kelchner, No. 3:CV-03-1134 (Dkt. 33 at 2 to 4).

Plaintiff claimed in the Middle District, as he does now here in the Western District, that

denying him a prayer rug violates his free exercise rights under the First Amendment and violates

RLUIPA.  The Defendants in the Middle District, filed a motion for summary judgment, which

Judge Munley granted in part and denied it in part.  Judge Munley granted it with respect to the

First Amendment free exercise claim, finding that no genuine issue of fact concerning whether

the restriction on prayer rugs as an incentive to engage in better behavior, which was part of the

behavior modification program of the SMU, satisfied the Turner v. Safley, 482 U.S. 78 (1987)

test in that the restriction rationally furthered a legitimate governmental interest in rehabilitation.

Dkt.  33 at 7-13.  Judge Munley denied the Defendants' motion for summary judgment as to the

RLUIPA claim.  Judge Munley noted that the Defendants there in support of their summary

judgment motion only argued that the restriction on the prayer rug did not impose a substantial

burden on Plaintiff's religious observance because the prayer rug is not mandated by the Qu'ran

nor a central tenet of the Sunni branch of Islam and because Plaintiff could use prison issued

towels or linen as a prayer rug.  Judge Munley rejected these arguments, reasoning that it was

irrelevant under RLUIPA whether a religious belief/practice was central to a religion for a

restriction to violate RLUIPA and that Plaintiff provided evidence that the use of towels, linen or

praying on the floor were not satisfactory alternatives.  Id. at 13 to 15.  Thereafter, Judge Munley

sua sponte reversed himself as to the grant of summary judgment on the First Amendment free

exercise claim.  Mohammad v. Kelchner, No. 3:CV-03-1134 (Dkt. 52).   He did so because he

felt compelled by the intervening decision of the Third Circuit Court of Appeals in Banks v.

Beard, 399 F.3d 134 (3d Cir. 2005) which held restrictions placed on inmates in the LTSU at

3

SCI-Pittsburgh (an even more restrictive program than the SMU) for purposes of behavior modification which included restrictions on receipt of newspapers and magazines presented a factual issue as to whether such restrictions met Turner.

Specifically, the Court of Appeals held that under the first Turner prong of deciding whether the restrictions bore a rational relationship to furthering a legitimate state interest in rehabilitation, i.e., modifying the prisoners' behavior, the DOC had not carried its burden.  Banks v. Beard, 399 F.3d at 141 - 142.  Specifically, the Court opined that

> the DOC has offered no evidence that the rule achieves or could achieve its stated rehabilitative purpose. In *Waterman*, the DOC submitted affidavits from two psychologists who testified that pornographic materials threatened to thwart the effectiveness of the treatment given to sex offenders and who agreed that limiting access to such material was a sensible rehabilitation strategy.  183 F.3d at 215.  In *Guajardo*, the defendants offered evidence as to the frequency and percentage of solitary confinements in the Texas Department of Corrections ("TDC") which showed that the negative perception of solitary confinement had a deterrent effect. 568 F.Supp. at 1368 ("a significant majority of TDC inmates have never experienced solitary confinement and less than half of those who are confined in solitary return a second time").  Here, there are no such supporting affidavits. The District Court presumably relied on Superintendent Dickson's testimony that the prohibition in question "gives us a means or method to say you comply, you modify your behavior, and you can obtain these things, these privileges," and his explanation that "we're very limited ... in what we can and cannot deny or give to an inmate, and these are some of the items that we feel are legitimate as incentives for inmate growth." (App.110)  The District Court did not examine the fit between the policy and its rehabilitative goals, whether the ban was implemented in a way that could modify behavior, or inquire into whether the DOC's deprivation theory of behavior modification had any basis in real human psychology, or had proven effective with LTSU inmates.

Id. at 141-42.

Judge, now Justice, Alito dissented as to the majority's requirement that DOC provide evidence that denial of privileges provides an incentive to improve behavior.  He noted that

> the majority concludes that the regulations are not rationally related to the goal of deterring misconduct because "the DOC has offered no evidence that the rule achieves or could achieve its stated rehabilitative purpose." Maj. Op. at 141.  In taking this approach, the majority misconstrues the nature of the first *Turner* factor.  This factor requires us to determine whether there is a "*logical connection* between the regulation and the asserted goal," *see* 482 U.S. at 89, 107 S.Ct. 2254 (emphasis added), not whether there is empirical evidence that the regulation in fact serves that goal.  The entire system of prison discipline might be imperilled if

each sanction for prison misconduct could not be sustained without empirical evidence that the sanction provided some incremental deterrent.

Id. at 149.

Subsequently, the United States Supreme Court granted certiorari and reversed the Court of Appeals, Banks v. Beard, 126 S.Ct. 2572 (2006), apparently agreeing with Judge Alito's point because the plurality held that

> First, the statement[1] and deposition set forth a " 'valid, rational connection' " between the Policy and " 'legitimate penological objectives.' " 482 U.S., at 89, 95, 107 S.Ct. 2254. The deputy superintendent stated in his deposition that prison authorities are "very limited ... in what we can and cannot deny or give to [a level 2] inmate [who typically has already been deprived of almost all privileges, see supra, at 2576], and these are some of the items that we feel are legitimate as incentives for inmate growth." App. 190.  The statement of undisputed facts (relying on the deposition) added that the Policy "serves to encourage ... progress and discourage backsliding by the level 1 inmates." Id., at 27.
> These statements point to evidence-namely, the views of the deputy superintendent-that the regulations do, in fact, serve the function identified. The articulated connections between newspapers and magazines, the deprivation of virtually the last privilege left to an inmate, and a significant incentive to improve behavior, are logical ones. Thus, the first factor supports the Policy's "reasonableness."

Id. at 2579.

During the pendency of the suit in the Middle District, after the decision of the Third Circuit in Banks but prior to the Supreme Court's decision in Banks, Plaintiff was in fact transferred to an LTSU program at SCI-Fayette.  Plaintiff then filed a motion to amend his complaint to delete the Defendants who were responsible for him at the SMU and to include new defendants who were responsible for the LTSU program at SCI-Fayette.  Judge Munley granted the Plaintiff's motion to amend and transferred the case to this District because SCI-Fayette is located within this District.  Mohammad v. Kelchner, No. 3:CV-03-1134 (Dkt. 52).

---

[1]  The "statement" referred to by the Court was the "statement of undisputed facts" which, according to the Court, "sets forth three 'penological rationales' for the Policy, summarized from the Dickson deposition: (1) to 'motivat[e]' better 'behavior' on the part of these 'particularly difficult prisoners,' by providing them with an incentive to move to level 1, or out of the LTSU altogether, and to 'discourage backsliding' on the part of level 1 inmates." Id. at 2579.

Plaintiff then filed an amended complaint in this District,  Dkt. [57], which named only Defendant Jeffrey Beard, who is the Secretary [i.e., leader] of DOC.  Plaintiff then filed a motion requesting leave to file another amended complaint,  which was granted, and Plaintiff's second amended complaint was filed, Dkt. [72], which is the operative complaint.

In the operative complaint, Plaintiff named Defendant Beard, and Father Bill Terza, the Chaplain Supervisor, Harry Wilson, the Superintendent of SCI-Fayette, and Mike Zaken, the LTSU Unit Manager.  In the operative complaint, Plaintiff claims that he is not permitted  to have a prayer rug and that regulations prohibit him from using a state issued towel or linen for other than their intended purpose, i.e., he cannot use them as a prayer rug.  He claims that this violates his First Amendment rights and RLUIPA.  Plaintiff alleges that he came to SCI-Fayette's LTSU in January 2005 and that he filed a grievance requesting permission to use a prayer rug. Defendant Zaken denied him use of the prayer rug, as did Father Terza.  In March 2005, Plaintiff protested this denial and refused, along with several other inmates, to obey an order to come inside from the yard.  As a result, Plaintiff received a misconduct charge for which he was found guilty and received a disciplinary sanction.  Defendants apparently denied him his prayer rug from January 25, 2005 until March 30, 2005.  However thereafter, Plaintiff was permitted to have his prayer rug in his cell.  By way of relief, Plaintiff seeks (1) to enjoin all defendants from prohibiting Plaintiff and all Level 5 (a reference to security level classification of prisoners) Sunni Muslims from possessing a prayer rug in their cells and to require them to issue a policy directing all such inmates be permitted to possess such a prayer rug in their cells; (2) compensatory and punitive damages; (3) reimbursement of the court filing fee and; (4) expungement of his misconduct.

In addition to his First Amendment and RLUIPA claims, Plaintiff invokes the Eighth Amendment as well.[2]  Defendants filed a motion for summary judgment, Dkt. [97], and a brief in

---

[2]  Although Plaintiff references the Fourteenth Amendment, the record of this case indicates that the invocation of the Fourteenth Amendment was merely a shorthand means of identifying the fact that it

support, Dkt. [98].  Plaintiff filed a declaration in opposition to the Defendants' motion,  Dkt. [102], and a brief in opposition, Dkt. [103] and a statement of disputed factual issues.  Dkt. [104].  Defendants filed a reply.  Dkt. [105].  Defendants also filed a supplement to their motion for summary judgment.  Dkt. [111].  Plaintiff also filed a supplement to his response to the summary judgment motion, Dkt. [112], as well as a second supplement.  Dkt. [113].  Thereafter, Defendants filed a second supplement to their motion for summary judgment.  Dkt. [114].   In the interim, Plaintiff filed a notice of change of address, indicating that he was transferred to SCI-Albion.  Dkt. [101].   In a motion for preliminary injunction, Plaintiff claimed that he is being housed in the Restricted Housing Unit at SCI-Albion and he is not being permitted to have his prayer rug.  Dkt. [106].

### B.  Applicable Legal Standards

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the

---

is the Fourteenth Amendment's incorporation of the First and Eighth Amendments' protections (which only apply against the Federal Government) that renders those protections applicable against the State Government and hence, applicable herein.

evidence is such that a reasonable jury could return a verdict for the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Thus, it must be determined "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

### C. Discussion

#### 1. First Amendment claim

In support of their summary judgment motion, Defendants argue that the Supreme Court reversal of the Third Circuit's decision in Banks v. Beard, means that the original ruling by Judge Munley should be reinstated. In none of the many filings Plaintiff made in response to the Defendants' summary judgment motion, does he address this argument or the significance of the Supreme Court's decision in Banks v. Beard. The court is persuaded that Judge Munley's original ruling in this respect is correct.

In Turner, the Court listed four factors governing the review of prison regulations that impinge on a prisoner's constitutional rights: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right in question that remain open to prison inmates; (3) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (4) whether there are reasonable alternatives available to the prison authorities. Turner, 482 U.S. at 89-90. The burden is upon the prisoner to show that a challenged prison regulation is unreasonable. Covino v. Patrissi, 967 F.2d 73, 79 (2d Cir. 1992).

Defendants point out that the "SMU [which is where Plaintiff was housed at the initiation of this lawsuit and which was the subject of Judge Munley's first opinion granting summary judgment to the Defendants on Plaintiff's First Amendment claim] is a less restrictive unit that

the LTSU, which is designed to receive its [i.e., the SMU's] failures[.]   A fortiori, if the

rehabilitative rationale is sufficient justification for the prayer rug in the SMU[,] it has to be at

least as sufficient a justification in an environment in which the need for a 'carrot and stick'

approach to rehabilitation is even more pronounced because it[s] subjects are even more

incorrigible."  Dkt. [98] at 6.   The court agrees and so adopts the reasoning of Judge Munley in

applying Turner to the deprivation of Plaintiff's prayer rug and reproduces it here:

> Our analysis of the four Turner factors leads us to conclude that there is no
> genuine issue of material fact that the SMU restrictions are reasonable.
>      1) Rational connection between the prison regulation and a legitimate
> governmental interest
>      To satisfy the first Turner prong, the defendant must show: 1) a legitimate
> interest to be protected by the restriction; 2) neutral application of the restrictions;
> and 3) a rational connection between the restriction and the legitimate interest.
> Waterman v. Farmer, 183 F.3d 208, 214-15 (3d Cir. 1999).  In performing this
> analysis, "we afford great deference to the judgments of prison officials 'charged
> with the formidable task of running a prison.' " Sutton v. Rasheed, 323 F.3d 236,
> 253 (3d Cir. 2003) (citations omitted).
>      In support of their motion for summary judgment, the defendants have
> submitted the declaration of Blaine Steigerwalt ("Steig. Decl.") and the SMU
> Inmate Handbook.  See Ex. to Def.'s Mot. For Summ. J. (Doc. 17).  Steigerwalt
> states that the SMU is "designed to safely and humanely handle disruptive and/or
> violent inmates or inmates whose presence in general population presents an
> ongoing threat to the orderly operation and security of the institution."  Steig.
> Decl. ¶ 2. Prisoners' property privileges are accorded and denied based on specific
> acts of misconduct.  "The goal of the SMU is . . .to encourage socially-positive
> behavior and eventually return them to general population."  Steig. Decl. ¶ 8. The
> prison gives every SMU prisoner a copy of the SMU Inmate Handbook, which
> describes in detail the restrictions and procedures of the disciplinary system. The
> SMU disciplinary system is applied to the most disobedient prisoners to ensure
> the security of the prison. Steig. Decl. ¶ 2.
>      We find that the defendants have shown that the property restrictions have
> a rational connection to a legitimate penelogical [sic] interest. Its goal is to deter
> disobedience with increased restrictions, and to encourage compliance with prison
> rules with rewards of additional property privileges. Through this system, the
> prison officials seek to alter the behavior of the most disobedient prisoners in
> order to enhance the security of the prison on the whole.
>      Maintaining a prison's internal order and discipline is perhaps the most
> important penelogical [sic] interest. Fraise v. Turhune, [sic, should be "Terhune")
> 283 F.3d 506, 517-18 (3d Cir. 2002); see also Pecunier [sic] v. Martinez, 94 S.Ct.
> 1800, 1811 (1974) (recognizing legitimate interest in internal prison discipline).
> Additionally, the prison has a legitimate interest in controlling dangerous
> prisoners to enhance general prison security. Cooper v. Tard, 855 F. 2d 125, 129
> (3d Cir. 2003) (upholding restriction on dangerous prisoners' right to gather for
> religious worship because of the posed security threat). Furthermore, there is no

doubt that the restrictions are neutrally applied, as all SMU prisoners are equally limited, and the restrictions apply to all property.

Most significantly, restricting or granting property as a means of deterring disobedience and rewarding good behavior is rationally related to the goals of internal prison discipline and order. See, e.g., Gregory v. Auger, 768 F.2d 287, 289-90 (8th Cir. 1985) (holding that restrictions on mail for prisoners who committed rules infractions were rationally related to the deterrence of future infractions because the prisoners were warned of the punishment); Daigre v. Maggio, 719 F.2d 1310, 1313 (5th Cir. 1983) (finding that restrictions on mail for prisoners in solitary confinement were rationally related to the legitimate prison interest of discipline because "solitary confinement is a disciplinary measure whose very essence is the deprivation of interests the first amendment protects"); Guarjardo v. Estelle, 568 F. Supp. 13[5]4, 1366-67 (S.D. Tex. 1983) (deciding that limitations on publications available to prisoners in solitary confinement were rationally related to the disciplinary process because they could strengthen the unpleasantness of such a punishment, and thus enhance the deterrence effect).

The SMU Inmate Handbook effectively deters misconduct by clearly informing inmates that rules infractions will result in increased restrictions. Furthermore, the gradual removal of restrictions for obedient behavior encourages them to adhere to prison rules. Here, Mohammad has an immediate incentive to behave to regain his cleaning supplies privilege. He has a long term incentive to conform his conduct so he can progress through the SMU Phases and reenter the general population, where he can posses a prayer rug. By limiting disobedience, the prison can more effectively control prisoners and ultimately reduce the risks of outbursts that pose security threats. Therefore, we conclude that the SMU property restrictions satisfy the first Turner prong because they are neutrally applied and rationally related to the legitimate goals of internal prison order and security.

2) Alternative means of exercising the right

When analyzing the second Turner factor, we must consider whether Mohammad has "alternate means of practicing his or her religion generally, not whether [the] inmate has alternative means of engaging in a particular practice." Sutton v. Rasheed, 323 F.3d 236, 255 (3d Cir. 2003) (quoting Dehart v. Horn, 227 F.3d 47, 55 (3d Cir. 2000)). Furthermore, the court must assess the right involved "sensibly and expansively." Id. at 254.

The defendants have established that a Muslim cleric visits Mohammad once a week, and that Mohammad is allowed to keep a prayer cap, the Qu'ran, and other religious texts in his cell. It is uncontested that Mohammad has been praying in his cell regularly. Mohammad has not asserted that without a prayer rug or a clean praying surface he would have no other means of practicing his religion generally, he avers only that the alternatives available to a prayer rug are insufficient to satisfy the tenets of Islam regarding that particular practice. Therefore, we conclude that there is no genuine issue of material fact that Mohammad has alternative means to practice his religion in general.

3)      The impact of accommodating the asserted constitutional right.

The third Turner factor focuses on the specific religious practice at issue, and the consequences that "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner, 482 U.S. at 90. Here, requiring the SMU to modify the property restrictions to allow Mohammad to pray on a clean floor would present a tremendous burden on the prison officials. Accommodating Mohammad would require prison guards either to provide Mohammad with whatever property he

sincerely believes is necessary to have a sufficiently clean floor, or to undertake a religious and constitutional analysis before disciplining Mohammad. Prison officials should not have to determine the relative sincerity of a prisoner's belief in the religious significance of an object before confiscating it as punishment for disobedience. Prison guards' focus and training is on ensuring safety and order, not understanding the constitutional ramifications of property restrictions. Implementing such a system and providing such additional training would pose a significant burden on the guards and the prison system in general. Therefore, we find that the defendants have satisfied the third <u>Turner</u> prong.

4)      <u>Alternatives to the regulation available to the prison</u>

In explaining the final factor, the Supreme Court held that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." <u>Turner</u>, 482 U.S. at 90. In the instant case, Mohammad asserts that the prison may allow him to keep a prayer rug in his records box, and since he will pay for the rug there will be a *de minimis* cost to the prison. The prison's interest in this case, however, is not financial. The defendants argue that allowing Mohammad to keep a prayer rug will undermine their disciplinary system. We agree. At present, Mohammad's desire for a clean praying surface is strong motivation for him to comply with prison rules. Granting Mohammad's request would subvert the prison's control over an admittedly incorrigible prisoner. Thus, this factor weighs in favor of finding that the regulation is valid.

In sum, we find that there is no genuine issue of material fact that Mohammad's demand for a prayer rug or cleaning supplies for his cell is inconsistent with his status as a prisoner. The SMU's system of using property privileges as motivation for dangerous prisoners to adhere to prison rules is rationally related to the legitimate penelogical [sic] interests of internal order and security. Mohammad has advanced no argument that he is prevented from practicing his religion generally. Furthermore, requiring the SMU guards and officials to adapt the disciplinary system would have a negative impact on the prison guards and the prison system in general. Finally, Mohammad has demonstrated no alternatives to the present system that would allow the prison to maintain the same system of behavioral motivation. Thus, we will grant the defendants' motion for summary judgment on the free exercise claim.

<u>Mohammad v. Kelchner</u>, No. 3:CV-03-1134 (Dkt. 33 at 8 - 13). The reasoning applies equally if not more so to the LTSU and its restrictions on property so as to provide an incentive for good behavior. <u>Cf</u>. <u>Banks v. Beard</u>, 126 S.Ct. 2572. The evidence of record shows what the policy goals of the LTSU are, Dkt. [104] at 19 to 26, and these are essentially the same as for the SMU. In addition, the record reveals that in answers to interrogatories, the very same rationale as provided in <u>Banks v. Beard</u>, was provided here for the restriction on property in the LTSU. Dkt. [104] at 26 (answer to interrogatory, apparently directed at Defendant Beard wherein it is

asserted that "The limitation on property [in the LTSU] is not only directed to prayer rugs. It limits nearly all property, with the exception of basic necessities such as blankets, sheets, and pillow cases, until the inmate can obey and comply with LTSU rules. The limitation on property is an incentive for inmates to conform their behavior to comply with the prison's rules. . . ."). Accordingly, based on the reasoning of Judge Munley, and the evidence of record, summary judgment should be entered in favor of the Defendants on Plaintiff's First Amendment claim.

### 2. RLUIPA

RLUIPA provides that "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).   As explained by one court, a claim under RLUIPA includes four elements: (1) that an institutionalized person's religious exercise has been burdened and (2) that the burden is substantial, and it is a plaintiff's burden to establish this. Spratt v. Rhode Island Dept. Of Corrections, __ F.3d __, 2007 WL 1031462, *3 (1st Cir. 2007). Once a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to show (3) that the burden furthers a compelling governmental interest and (4) that the burden is the least restrictive means of achieving that compelling interest. Id.

A "substantial burden" is one that is " 'oppressive' to a 'significantly great' extent." Warsoldier v. Woodford, 418 F.3d 989, 995 (9th Cir. 2005) (quotations omitted). It "must impose a significantly great restriction or onus upon [religious] exercise." Id. (quotations omitted). A substantial burden includes situations "'where the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his belief.'"  Id.

Here, the court finds that Plaintiff has not met his burden to demonstrate that denial of a prayer rug imposes a substantial burden on his religious belief.  As Defendants point out, a prayer rug is not essential to Plaintiff praying, rather, the essential requirement for Plaintiff to pray is that the area on which he prays be clean.  Dkt. [98] at 6 to 7.  Hence, a clean towel or linen can suffice or even a cleaned floor.  Id.  Nor has Plaintiff shown that this is not the case.  In fact, in his filings before the Middle District, Plaintiff as much as acknowledged such.  He stated that he "sacrificed one of his clean undershirts as a substitute for a rug when staff ordered him not to pray on the sheets." Mohammad v. Kelchner, No. 3:CV-03-1134 (Dkt. 22 at 3).  Although Plaintiff indicates that there were reasons why he could not use a towel or linen because prison rules forbade him to do so and he could not clean the floor because of restrictions imposed on him, the evidentiary record does not, in the court's estimation, show that Plaintiff has carried his burden to demonstrate that denying him a prayer rug imposed a substantial burden on the practice of his religion.  Hence, having failed to carry his burden to show a substantial burden, the Defendants would be entitled to summary judgment.

Even if, however, we assumed for the sake of argument that Plaintiff did carry his burden, we find in the alternative that the Defendants have shown no material factual dispute with respect to the two prongs on which they bear the burden.  Rehabilitation of the most incorrigible prisoners in the system as is the definition of those  in the LTSU, and inducing them to comply with the rules by the "carrot and stick" method, and consequently promotion of good order, are, in this court's opinion, compelling state interests.  See, e.g., United States v. Cothran, 855 F.2d 749, 751 (11th Cir.1988)("[T]he state [has] a compelling interest in limiting their liberty in order to effectuate their rehabilitation and to protect society."); Burkholder v. Wolfe, 2007 WL 90427, at *5 (M.D.Pa. Jan. 9, 2007)  ("[A] State has a compelling interest in rehabilitation.").  See also Cutter v. Wilkinson, 544 U.S. 709, 722-23 (2005)("While the Act [i.e., RLUIPA] adopts a 'compelling governmental interest' standard, . . . '[c]ontext matters' in the application of that standard.  Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order,

13

safety, and security in penal institutions.  See, e.g., 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' ")(footnote and some citations omitted).

In addition, given that most other privileges or rights are, by definition, taken away from prisoners in the LTSU, it would appear that limitation of property to the barest minimum required so as to provide an incentive to get out of the LTSU is the least restrictive means of furthering the Government's compelling interest in getting the most incorrigible prisoners to modify their behavior by complying with rules via use of the "carrot and stick" approach.  In other words, by the time a prisoner gets to the LTSU, there is little else the prison can utilize to provide incentives for proper behavior, other than limiting property available even if it is property of a religious nature.  Given that the summary judgment record shows no genuine material factual dispute that prisoners in the LTSU are the most incorrigible and the prison needs to attempt to modify their behavior, i.e., rehabilitate them, and there does not seem to be a less restrictive method given that, by definition, all other less restrictive efforts have failed to accomplish this goal, summary judgment should be entered in favor of the Defendants on the RLUIPA claim as well.

### 3.  Alternative Grounds for Summary Judgment

In the alternative, Plaintiff's claims for injunctive relief fail for two independent reasons at least with respect to the LTSU.  First, because Plaintiff has been moved out of the LTSU at SCI-Fayette, his request for injunctive relief against Defendants Wilson, Zaken and Fr. Terza is now moot and should be dismissed as such.  See, e.g., Marrie v. Nickels, 70 F.Supp.2d 1252, 1259 (D.Kan. 1999) ("Generally, an inmate's transfer to another prison or release moots his request for declaratory or injunctive relief.") (collecting cases); Chapdelane v. Keller, No. 95-CV-1126, 1998 WL 357350 (N.D.N.Y. April 16, 1998).  The injunctive relief request may not be

moot as to Defendant Beard who presumably has authority over Plaintiff at any and all DOC institutions.

Additionally, with respect to the LTSU and Plaintiff's request for injunctive relief, this claim is  moot because the only relief he would be entitled to, i.e., the keeping of a prayer rug in his cell,[3] was already provided to Plaintiff.  Plaintiff received a prayer rug in his LTSU cell as of March 30, 2005, and was permitted to keep it in his cell thereafter.  Dkt. [98] at 4.  Lowe v. Duckworth, 663 F.2d 42, 43 (7th Cir. 1981)("When all the relief sought has been obtained, there no longer exists a live controversy, and the case must be dismissed as moot.");  Lowary v. Lexington Local Bd. of Educ., 854 F.2d 131, 133 (6th Cir.1988)("If a party has already obtained all the relief sought on appeal, the case is moot and must be dismissed.") (citing DeFunis v. Odegaard, 416 U.S. 312, 316-17 (1974)); Athridge v. Quiggs, 852 F.2d 621, 624 (D.C. Cir. 1988)("It seems clear that Athridge has obtained all the relief he is entitled to demand, and accordingly that his case is now moot.")

Plaintiff's claims for compensatory and punitive damages should be dismissed based on qualified immunity.  The Defendants are entitled to qualified immunity because it was not clearly established that prisoners had a right to a prayer rug in the LTSU environment.  Cf.  Banks v. Beard, 126 S.Ct. 2572 (restrictions on prisoner's First Amendment right to newspapers not violated by LTSU rules restricting such); Hudson v. Maloney, 326 F.Supp.2d 206 (D.Mass. 2004)(granting summary judgment on qualified immunity grounds where prison forbade full sized prayer rugs but permitted "prayer towels" instead). See also Baptist v. Russell, 1997 WL 308842 (N.D. Ill. June 2, 1997)(qualified immunity defeats both compensatory and punitive

---

[3]  While in the operative complaint, Plaintiff also requested injunctive relief on behalf of all level 5 Sunni Muslims, to require that they be permitted to have prayer rugs,  Plaintiff was not permitted to pursue this case as a class action, Mohammad v. Kelchner, No. 3:CV-03-1134 (M.D. Pa.) Dkt. [14], memo order denying class certification), and hence, has no standing to request relief on behalf of all level 5 Sunni Muslims.

damages); <u>Vickery v. Jones</u>, 856 F.Supp. 1313 (S.D. Ill. 1994) (same), <u>aff'd</u>, 100 F.3d 1334 (7th Cir.1996) .

As to his Eighth Amendment claim, Plaintiff has adduced no evidence concerning the deprivation of the "minimal civilized measure of life's necessities[,]" <u>Young v. Quinlan</u>, 960 F.2d 351, 359 (3d Cir. 1992)(internal quotes omitted),[4] such as being deprived of food, clothing, shelter, sanitation, medical care or personal safety. <u>Griffin v. Vaughn</u>, 112 F.3d 703, 709 (3d Cir. 1997). Hence, summary judgment should be entered in the Defendants' favor on Plaintiff's Eighth Amendment claim.

To the extent that Plaintiff seeks declaratory relief, which Defendants appear to believe he does, his declaratory relief claims are barred because he seeks merely to have this court declare that past actions of the Defendants have violated his rights, something that is forbidden. The Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." <u>P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 146 (1993); <u>Mehdipour v. Matthews</u>, 22 Fed.Appx. 978, 979 n.1 (10th Cir. 2001)("The only injunctive relief sought by Mehdipour in his complaint was a declaratory judgment that the defendants had violated his rights. However, '[t]he Eleventh Amendment does not permit judgments against state officers declaring that they violated federal law in the past.' ")(quoting, <u>Johns v. Stewart</u>, 57 F.3d 1544, 1553 (10th Cir. 1995)).

As to the requested relief of expungement of his disciplinary charge for refusing to come indoors from the yard in protest of his being denied his prayer rug, Plaintiff essentially admits he broke the rules and so the disciplinary charge is apt. Plaintiff does not cite any law or legal rule by which an admitted violation of the disciplinary rules should be excused simply because Plaintiff was motivated by a desire to protest. Hence, Plaintiff is not entitled to the relief requested.

---

[4] <u>Young</u> was superceded by statute on other grounds. <u>Ghana v. Holland</u>, 226 F.3d 175, 184 (3d Cir. 2000).

Accordingly, for any of the foregoing reasons, Defendants are entitled to summary judgment.

### 4. Transfer to Albion

During the pendency of this case, Plaintiff has been transferred again. This time, he was transferred to SCI-Albion, where he was placed in the RHU. Plaintiff asserted that although he had his prayer rug in the LTSU at SCI-Fayette, when he was transferred to SCI-Albion his prayer rug was removed from him. Because the persons responsible for Plaintiff at Albion are not parties to this suit, and this court has no personal jurisdiction over them, and because Plaintiff has not sought to amend his complaint to name them and because amendment at this late date would not further judicial economy and only prolong the present case, Plaintiff should simply file a new civil rights action, naming as defendants those who are responsible for the alleged deprivation at SCI-Albion.

CONCLUSION

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/ *Amy Reynolds Hay*
United States Magistrate Judge

Dated: 26 April, 2007

cc:    The Honorable Donetta W. Ambrose
       Chief United States District Judge

       Yassin Safdar Mohammad
       CU-0143
       SCI Albion

17

10745 Route 18
Albion, PA 16475

Kemal Alexander Mericli, Esq.  by Notice of Electronic Filing